## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SALVATORE MINOPOLI,<br><br>                        Plaintiff,<br><br>       v.<br><br>LARGO INC., LARGO CLEAN ENERGY<br>CORP., PAULO MISK and  PAUL<br>DALGLISH,<br><br>                     Defendants. | **No.**<br><br>**COMPLAINT**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiff Salvatore Minopoli ("Plaintiff") alleges the following against defendants Largo Inc. ("LGO"), Largo Clean Energy Corp. ("LCE"), Paulo Misk ("Mr. Misk, together with LGO and LCE, the "Largo Defendants"), and Paul Dalglish ("Mr. Dalglish").

### <u>INTRODUCTION</u>

1.      This is an action for fraudulent inducement, breach of the duty of good faith and fair dealing, tortious interference, quantum meruit, conversion, replevin, and declaratory judgment. The Largo Defendants lured Plaintiff away from gainful employment—with Highview Power, a competitor of LCE—with the promise that Plaintiff would run LCE, a new clean energy company that Defendants failed to disclose had no customers, no saleable products, few or no employees with relevant experience, and no revenue. Defendants hired Plaintiff in order to use his name and reputation, industry expertise, and access to customers to jumpstart LCE and then, once they had that access, they, along with Mr. Dalglish, promptly terminated him. As a result, Plaintiff has lost income, an ownership stake in Highview Power worth approximately $900,000, and his reputation and professional standing have been damaged thus tarnishing his career.

## JURISDICTION AND VENUE

2.      The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332. Plaintiff is a citizen of the State of Maryland and Defendants are citizens of Massachusetts and/or Canada. The amount in controversy exceeds $75,000 exclusive of interest and costs. The Court has jurisdiction over Plaintiff's claim for a declaratory judgment pursuant to 28 U.S.C. § 2201.

3.      Venue is proper in this District because a substantial portion of relevant events giving rise to Plaintiff's claims took place here. LGO/LCE do business in this District and have a "sales office" at 500 Research Dr., Wilmington MA. LCE's headquarters and its energy storage operations are at the same address according to its website and LCE lists its principal place of business with the Massachusetts Secretary of State as 300 Brickstone Square, Suite 201, Andover, Massachusetts.  In connection with his inducement into employment, Plaintiff was invited to and attended an LGO/LCE meeting, with many board members in attendance including Mr. Misk, in this District prior to his employment start date at which technology capabilities and costs were discussed. Largo's term sheet to Plaintiff stated that Plaintiff's "position will report to Paulo Misk, Chief Executive Officer, and work closely with Largo's COO and the team [] based in Boston." A substantial majority of Defendant Mr. Dalglish's actions, as relevant to this case, took place from LCE's facilities or offices in Massachusetts.

## FACTS

### A.  The Parties

4.      Plaintiff, as described below, is an energy executive with over thirty years of experience in the industry.

5.      Defendant LGO is a mining company that is in the process of attempting to shift to

a renewable energy company. LGO's website has a temporary landing site that states: "Enabling the planet's transition to 100% renewable energy. This is a new and exciting shift for our company. . . . We are Largo. Driving the world's shift to a low-carbon future through innovative energy storage solutions powered by responsibly sourced vanadium."[1] Historically, LGO has mined vanadium, a rare element that may be used for multiple industrial purposes. LGO is headquartered in Toronto, Canada and does business in this District. The company trades on the NASDAQ under the ticker symbol "LGO."

6.    LCE is a Delaware corporation headquartered in Massachusetts and its production facilities are also in Massachusetts. LCE's website—which had not gone live at the time Plaintiff was solicited—states that LCE's "goal is to become a leading supplier of safe, durable, long-duration grid-scale vanadium redox flow batteries (VRFB) for the fast-growing global renewable energy storage market."[2]

7.    LGO and LCE operate as a single company. LCE is a wholly owned subsidiary of LGO. Although Plaintiff was hired to work for LCE and his employment agreement is with LCE, LGO acted as his employer in all respects, including paying Plaintiff, exercising control over Plaintiff, administering Plaintiff's benefits, and providing Plaintiff's (untimely) COBRA notice after his termination. LGO and LCE have a single board of directors and use a single in-house legal department. LGO and LCE are sometimes collectively referred to as the "Company."

8.    Defendant Paulo Misk is the Chief Executive Officer of LGO and President of LCE. As described below, Mr. Misk's statements induced Plaintiff to leave his employment and work for LGO/LCE. Mr. Misk signed Plaintiff's employment agreement as the "President" of LCE.

---

[1] Largo Inc. - Homepage

[2] About | Largo Clean Energy

9.     Defendant Paul Dalglish ("Mr. Dalglish") claims to be "an operations executive who specializes in M&A, business growth and operational turnarounds." Mr. Dalglish was instrumental in subverting Plaintiff's employment agreement and forcing Plaintiff out of the Company.

**B.  Plaintiff's Career In The Renewable Energy Industry**

10.    Plaintiff has a Bachelor of Chemical Engineering degree and a Master of Engineering Management degree, completed in or about 1990.

11.    Plaintiff has been employed in the energy industry since at least 1986, working his way up from production engineer to engineering manager, through various positions as project manager and, since 2012, as an executive for Hamon Corporation, followed by Wartsila and, as discussed below, Highview Power. Plaintiff has attended and/or spoken at hundreds of conferences, made thousands of connections in the industry, and cumulatively worked hundreds of thousands of hours in his field.

12.    Plaintiff's areas of expertise include project/construction management, business development and origination, project controls, and contract negotiation and administration with large complex projects.

13.    Beginning in 2019, Plaintiff came to be employed as Vice President of Energy Business for Highview Power. Highview is a British company with offices in Alexandria, VA among other places. Highview has a commercially available renewable energy storage product with zero-emissions that can heat up to 200,000 homes for a day.  The company has projects underway and with the leadership of Plaintiff, achieved a healthy pipeline of business.

14.    Highview would be a competitor of LCE if LCE had a viable business.

15.    Highview's website states: "As the global leaders in cryogenic energy storage, we

own and maintain a significant portfolio of patents covering all aspects of our proprietary technology and its control, protecting innovations relating to the process, system components and methods of operation."[3]

### C.   Defendants Solicited Plaintiff

16.     Plaintiff was happily and gainfully employed by Highview. In his role as VP, he was working with top management including the CEO on a daily basis. Plaintiff had total P&L responsibility for the Americas that included business development, project deployment, and aftermarket services. Plaintiff also had an ownership stake in Highview consisting of options worth approximately $900,000.

17.     Plaintiff was not seeking other employment and Highview was satisfied with Plaintiff's performance.

18.     In February 2021, Plaintiff was contacted by Bedford Executive Search Group ("Bedford"), acting as an agent on behalf of the Largo Defendants, to discuss an employment opportunity with LGO's wholly-owned subsidiary LCE.

19.     Plaintiff initially refused the conversation because he was happy in his position with Highview and did not want to give up his ownership stake in Highview. On information and belief, Bedford communicated Plaintiff's position to LGO/LCE.

20.     Bedford then contacted Plaintiff a second time and informed him that LGO planned to hire him as Managing Director of LCE and suggested that Plaintiff interview with Mr. Misk (CEO of LGO) and Ernest. Cleave (CFO of LGO).

---

[3] Technology | Highview Power

21.     This representation induced Plaintiff to interview with LGO and he did so. Specifically, the representation that Plaintiff would run the company as Managing Director within 12 month of his employment is what enticed Plaintiff to speak to Messrs. Misk and Cleave.

22.     At the interview and in subsequent communications, Mr. Misk, Mr. Cleave and others at LCE misrepresented to Plaintiff and/or allowed him to believe that LCE had mature technology at acceptable costs.  They presented costs and capabilities that were at the levels of competing technologies and the state of commercial readiness.

23.     Bedford subsequently informed Plaintiff that he was the selected candidate and was approved by the board of LGO. However, rather than offer him the position of Managing Director as originally discussed, LGO offered the lower position of Vice President of Operations, with a promotion to Managing Director after one year of employment.

24.     Plaintiff questioned this change; Mr. Misk told Plaintiff that the culture at LCE is "different" and that LGO's employees would not adjust well if he were brought in at the top right away so he should come in a step lower and then be promoted.

25.     Mr. Misk told Plaintiff to trust him, and "this would be the best approach for success." It was represented to Plaintiff that LGO was going to transition to an energy company rather than a mining company, LGO needed Plaintiff's experience to continue to build the business and deploy projects successfully, and once he was promoted Plaintiff would be leading the entire business.

26.     Plaintiff relied on Mr. Misk's statements; he signed the employment agreement that represented he would be promoted to Managing Director of LCE after one year of employment. Specifically, the employment agreement stated:

> **Advancement.** On the one year anniversary of your start date, provided that you remain employed with the Company and in good standing, you will be promoted to

6

the position of "Managing Director (MD) of Largo Clean Energy" with your Base Salary increasing to $350,000, the maximum amount of your STIP [Short Term Incentive Plan] increasing to 40% of your Base Salary, and the maximum amount of your LTIP [Long Term Incentive Plan] increasing to 50% of your Base Salary.

27.     The Largo Defendants had no intention of honoring this promise at the time it was made.

28.     The representation that Plaintiff would lead the business at LCE was the sole motivating factor in Plaintiff's decision to leave Highview Power.  Plaintiff gave up his $900,000 ownership stake in Highview to join LCE only after extensive consultation with the CEO of Highview who ultimately gave his blessing and believed this was a good move for Plaintiff's career.

**C.     Plaintiff Begins Work With LGO/LCE**

29.     Upon Plaintiff's hiring, the Largo Defendants immediately began to capitalize on his stature in the industry. On May 5, 2021, the Largo Defendants issued a release via Yahoo! Finance:

**Appointment of Mr. Salvatore Minopoli as VP of Operations**

"The appointment of an *energy industry expert* [emphasis added] of Mr. Minopoli's caliber is a further validation of Largo's proposed business proposition and the tremendous opportunity that exists with our anticipated global deployment of our VCHARGE± system," said Paulo Misk, President and CEO of Largo. "Salvatore's in-depth knowledge of the energy sector, combined with his extensive leadership experience in advancing new energy projects will enable Largo to strategically advance the development of its clean energy division."

Mr. Minopoli brings over 30 years of U.S. energy industry experience to the Largo executive team, including extensive development and execution of utility-scale projects in both regulated and merchant energy markets in the U.S. and internationally. He has extensive experience in the successful development and execution of gas and renewable projects, holding leadership positions for both major U.S. utilities and energy technology providers. Most recently, Mr. Minopoli served as Vice President of Highview Power where he led the deployment and business growth of its long-duration energy storage technology in the U.S. Minopoli holds a BS in Chemical Engineering from Catholic University, an MS in

Engineering Management from George Washington University, and served as an officer in the United States Navy, Naval Construction Battalion.

30.     The May 5 press release also had a statement that was falsely attributed to Plaintiff:

"Largo is a global leader in the supply of high-quality vanadium and possesses one of the most advanced and commercially available energy storage technologies for long-duration. This combination is expected to bring prospective customers unique value and assurance for their clean energy transition," commented Minopoli. "I'm excited to join the talented executive team at Largo as we work to become a long-duration energy storage supplier of choice and assist in the world's decarbonization efforts through the deployment of our VCHARGE± system."

31.     Despite the external fanfare, the Largo Defendants made no internal announcement of Plaintiff's arrival. Rather, when he began working for LGO/LCE, the few employees who were with the company at that time had not been made aware of Plaintiff, his hiring, or what he would be doing for LGO/LCE.

32.     Plaintiff discovered immediately upon starting that LCE was *nothing* like what he had been led to believe. LCE had no customers or pipeline of real energy projects, and it appeared to be nothing more than a dysfunctional startup company that was treading water at best and had not completed the design of its purported technology or the validation of its performance.

33.     Vendors reported directly to Plaintiff in writing that LCE did not have sufficient experience and that there were major deficiencies in the completeness and detail of the design of the technology.

34.     LCE had no employees who could perform the main functions of business development, project execution or supply chain and thus Plaintiff was given the responsibility of handling everything, with the exception of the core technology, and immediately hiring personnel for the function of Supply Chain Management, Information Technology, and Application Engineering.

35.     Regarding the company's technology, it appeared that LGO/LCE was providing

dubious or misleading information to potential customers about its products that included unsupported cost and performance information without the appropriate empirical data to back up its representations, and an exaggeration of the maturity of LCE's technology.

36.     Many of the submitted proposals were found to be severely below the cost that LCE could actually implement them for. The construction of the LCE manufacturing facility, in Massachusetts, had not started when Plaintiff joined and to this date is not producing any product and the company is not generating any revenues.

37.     In or about July 2021, LCE announced a sales contract with Enel Green Power España for a small energy storage project. Under the contract, LCE was obligated to deliver a battery system for a project in Spain with expected commissioning in Q4 2022.

38.     Plaintiff identified that the Enel contract had costs that Plaintiff projected to be overrun by 60% and a design that was incomplete and not validated as of the time of the contract.

39.     Plaintiff advised management (including Mr. Misk) that this pending contract includes significant risks associated with cost, performance and schedule and which included excessive termination provisions. Mr. Misk had no interest in the matter.

40.     LCE's total lack of products, capable personnel and revenue were omitted from any discussions with Plaintiff during his recruiting process. This information would have confirmed that the LCE technology was overpriced and not commercially ready and if Plaintiff had known of such, he never would have left Highview for employment with the Largo Defendants.

41.     After hiring Plaintiff, LGO/LCE hired a Director of Development and Investor Relations who resigned after only two weeks. The Director of Development felt that "the company has no products to go to market and attract potential investors" and he was concerned about "the company's direction and the falsification of information to the capital market."

42.    Moreover, LCE—a purported energy company—was owned, controlled and operated by LGO, a mining company that had no experience in or knowledge of the energy business.

43.    Therefore, Plaintiff was required to use his connections and reputation, developed over years in the energy industry, to promote LCE. LCE clearly benefited from that with immediate attention from potential customers and the creation of an active project pipeline.

44.    The Largo Defendants benefited greatly from Plaintiff's industry experience and connection. Plaintiff became a board member of the Energy Storage Association ("ESA") and the California Energy Storage Alliance ("CESA").  CESA welcomed him and highlighted to the industry that he was an industry veteran with expertise in the energy market, and that although he had been involved with CESA for many years, he was now leading LCE's Operations.

45.     ESA and CESA are key associations that all energy storage industry participants are aware of. LCE was not a member of either organization and the Largo Defendants were not even aware of them before Plaintiff joined LCE.

46.    It was immediately clear to Plaintiff that LGO and/or LCE were not experienced in running an energy company and lured Plaintiff away from his previous employment to remedy deficient performance in regard to what LGO has described as its "transformational strategic shift to the production of vanadium based electrical energy storage systems."[4]

47.    The company clearly wanted to make a splash in the industry, and it relied heavily on Plaintiff's experience and reputation to do so. On June 9, 2021—just weeks after Plaintiff began working for LGO/LCE—the Largo Defendants held a promotional event called "Battery Day."

[4]    https://www.largoresources.com/English/news-and-media/news-details/2021/Largo-Resources-Advances-its-Strategic-Focus-on-Vanadium-Based-Energy-Storage-Systems-and-Announces-Solid-Second-Quarter-2021-Financial-Results-with-Net-Income-of-8.4-million/default.aspx

The speakers consisted almost entirely of LGO executives who had no knowledge of or experience with batteries. Plaintiff was one of only two LCE employees with any knowledge of batteries who spoke at Battery Day.

48.     In its August 10, 2021 press release summarizing Battery Day, the company highlighted that Plaintiff had been appointed as "VP of LCE Operations" in order to "align[] with its belief in the opportunities expected to arise in the transition to VRFB production[.]"

49.     In an incredibly short time with the company, Plaintiff obtained substantial results leveraging his relationships and energy market awareness.  This included project opportunities with major utilities and developers, including Concentric, TECO, and NextEra as well as other opportunities and interest.  Plaintiff also hired key staff members to build the supply chain organization and put clear project implementation processes in place to effect successful execution of projects.

50.     At or about the time Plaintiff joined LGO, the company also brought Ian Robertson ("Mr. Robertson"), a career energy executive from Canada, onto the board to bring energy experience that would reflect well to the market.

51.     On or about July 25, 2021, Ian Robertson visited the Wilmington, MA facility and met with Plaintiff and other key individuals at LCE.

52.     With witnesses present, Mr. Robertson stated that he planned to take over LCE.  He said he will move Mr. Misk aside because "he's just a miner and doesn't know anything about the energy business," convince the board to transition the company from a mining company to an energy company, and that if Alberto Arias (Chairman of LGO/LCE's Board) does not listen to him, he will leave.

53.     Mr. Robertson openly admitted his goal of artificially inflating LGO's stock price

and selling out when the shares reach $60; LGO's stock has lost approximately 50% of its value since July 2021.

54.     Subsequently, Mr. Robertson was given all the approvals he requested and was announced as interim President of LCE. Mr. Robertson brought in Mr. Dalglish, whose email signature stated that he was "Chief of Staff" and who indicated in at least one email that he considered himself to be Plaintiff's employer.

55.     Shortly after taking over as President and once he was exposed to the real cost and operating information, Mr. Robertson was skeptical of the viability of the LCE business.  He was very concerned with the costs and the fact that the technology had never operated for a sufficient period of time to validate its performance and reliability.

56.     Mr. Robertson was witnessed by more than just Plaintiff to say "f*** there is no business here," that "we don't know if this technology works," and "are we building the very first project at Enel without knowing if it will work?"

57.     Plaintiff advised Mr. Robertson and Mr. Dalglish that the technology was not commercially ready and required approximately 12 months to validate in the field, refine and complete the design to be market competitive.

58.     Ian Robertson and Dalglish dismissed Plaintiff's recommendation and then began a campaign to embellish and falsely represent the cost of the LCE technology to present a competitiveness of the technology that would reflect well to the market and to the LGO board to get their approval for the transition of the company.

59.     The costs were assembled in days and were not based on real design or firm equipment or installation pricing, but rather costs based on gut feels and internet searches by individuals with no specific experience in LCE's claimed areas of business.

60.     Dalglish even requested Plaintiff to change the Enel project design which was LCE's only project under contract and in full execution.  Plaintiff objected stating that 1) there was no credible detail behind the design to make such a change and 2) this change would mean virtual termination of the project and would impose significant and permanent reputational risk to LGO/LCE.

61.     The design was not changed, but Dalglish was left displeased.  Ian Robertson and Dalglish also projected future cost reductions of the technology that are baseless and unsupported by substantive or quantitative information.  Ian Robertson and Daglish also stated that the announcement of the projects that Plaintiff originated, specifically Concentric and TECO, were critical in their efforts to convince the LGO board of the transition for the company and to show the market evidence of its sales activities.

62.     Plaintiff and others in the company became aware of significant internal conflicts between Ian Robertson/Dalglish with corporate, other members of the executive team and other board members who have experience in mining but not energy.

63.     Dalglish, a contract employee, also exercised control over Plaintiff and in at least one email indicated that he was Plaintiff's employer.

64.     Ian Robertson/Dalglish immediately requested the LCE executives to not participate in any more LGO executive calls, directed that outside counsel be used on all LCE legal matters instead of LGO corporate counsel, and wanted to bring in their own HR, Finance, and IT personnel.

65.     Dalglish further added to the dysfunction at LCE, generally treating employees poorly, prompting documented harassment complaints from female employees, and boasting that

he regularly works in the United States—including in Massachusetts—for companies including LCE without a visa.

**D.     Plaintiff Was Forced Out Of The Company**

66.     Dalglish immediately focused on Plaintiff and forced him out of the company.

67.     In July 2021, Plaintiff learned that, despite the promise to promote Plaintiff to Managing Director, Defendants had begun a search for a Managing Director for LCE.

68.     Upon hearing this from the Bedford Group—the same group that had recruited Plaintiff on LCE's behalf—Plaintiff was baffled and respectfully informed Mr. Dalglish of his contractual agreement to be promoted to Managing Director.

69.     Dalglish, despite purportedly being a "Chief of Staff," had never been told about or sought to learn of Plaintiff's employment contract; this strongly indicates that LGO had no intention whatsoever of promoting Plaintiff despite the clear contractual promise by LGO.

70.     Dalglish ignored Plaintiff's employment contract and hired the Bedford Group to search for a Managing Director.

71.     Bedford proceeded with the recruitment for the managing director position and other positions requested by Dalglish knowing that it was in disregard of Plaintiff's contract (Bedford had helped to induce Plaintiff into that contract).  Inexplicably, Bedford contacted Plaintiff and asked him if he was interested in applying for a *lower position* at LCE even though he had a contract for Vice President with a promotion to Managing Director.

72.     Plaintiff declined, informing Bedford of his contractual right to the Managing Director position.

73.     At about the same time, Dalglish requested that Plaintiff provide him with an alternative course of action that would make Plaintiff happy.  After Plaintiff provided a proposed

amendment to his employment contract, Dalglish responded that he needed two months to respond. After Plaintiff expressed his disappointment, Dalglish asked for two weeks.  This was clearly nothing more than a tactic to buy time until Dalglish had others in place.

74.     Plaintiff expressed his concerns to the CFO, Ernest Cleave, and the LGO legal counsel, Liz Valente, all of whom expressed to Plaintiff their disagreement with Daglish and questioned why he was preventing fulfillment of the obligations of the executed employment agreement with Plaintiff.

75.     On Sept. 25, 2021, Cleave stated to Plaintiff that "Daglish was trying to buy time." On Oct. 1, 2021, Cleave stated to Plaintiff that "Daglish is still playing games." On October. 5, 2021, in Wilmington, Massachusetts, Valente explained to Plaintiff that she attempted to discuss the matter with Dalglish, but said "he was difficult."

76.     Plaintiff also contacted board member Jonathan Lee, who expressed concerns on a call with him on October 5.  Lee stated by phone, "well that's why we brought you here, because there was no one else here that knows the energy business.  This a problem.  We can't lose you. Let me talk to Alberto [Arias, chairman of the board]."

77.     On Oct. 5, Cleave said that board member Jonathan Lee tried to call him a few times about the situation.  On Oct. 7, Cleave told Plaintiff that he was going to ask the LGO board "to get rid of Daglish with immediate effect."

78.     Plaintiff was subsequently informed by Mr. Dalglish that his employment was terminated.

79.     Nonetheless, LGO/LCE through Mr. Dalglish asked Plaintiff to continue working for LGO/LCE even after his termination, thus reinforcing that Plaintiff was not terminated due to any fault of his own.

80.     In addition to terminating Plaintiff, Defendants stole from him the cell phone number he owned for years and had brought to LGO/LCE. Specifically, when Plaintiff began working for Defendants, he ported over his phone number to them, and Defendants agreed to pay the bills for that number without any agreement that Defendants would own the number. The phone number had belonged to Plaintiff for three years and was the phone number that he used to conduct business and family affairs.

81.     After the end of Plaintiff's employment, Defendants refused to give the phone number back to Plaintiff despite his repeated requests. The phone number is not being used and has the following outgoing message as of December 12, 2021: "You have reached Largo Clean Energy. Sal Minopoli is no longer with the organization. For business related matters, please call Eric Watson at 617-819-2348 …. This voicemail is not monitored." Defendants took Plaintiff's phone number for no reason other than to deny Plaintiff his right to ownership of the number and did not retain the number for any legitimate reason other than to secure his contacts.

82.     Moreover, Plaintiff's employment contract had a non-compete provision among others. After Plaintiff's termination, Defendants, acknowledging that Plaintiff was terminated without cause, indicating that they would waive the non-compete provision, but they would not respond to Plaintiff's request for clarification that the provision was being waived.

83.     Plaintiff's exemplary career in the power industry has been significantly damaged by LGO's actions. Plaintiff left gainful employment and a $900,000 ownership interest in Highview. Plaintiff was recognized in the industry as an expert in power origination and project execution for energy projects.  Now, only several months after his start date with LGO, Plaintiff is out of work. As a highly paid senior-level employee at 57 years of age, Plaintiff will likely  face significant challenges in attempting to find new employment.

84.     The reputational damage for departing a company after only 5 months of employment will be significant and will impact Plaintiff's ability to obtain a similar position in the energy industry. If Plaintiff had known that LGO had no real intent of promoting him to managing director—or even employing him for any meaningful amount of time—and that LCE was a dysfunctional company with no products or pipeline, he would not have taken the position. Plaintiff would have remained at Highview Power where he was establishing a large pipeline of activities and significant company investment.

85.     Plaintiff also suffered tremendous mental distress while at LGO/LCE and specifically during the events with Daglish, which created severe anxiety.  Daglish frequently texted or called Plaintiff well into the late evenings and on weekends asking him for support and industry information.

COUNT I
Fraudulent Inducement
(Against the Largo Defendants)

86.     Plaintiff repeats and realleges paragraphs 1-85 as if fully set forth herein.

87.     Defendants made representations to Plaintiff that were material and induced him to leave his employment with Highview Power. Defendants further misrepresented and/or allowed Plaintiff to believe that LGO/LCE had the elements necessary to run a business including having a working business model, revenue, a product pipeline, and employees to carry out essential functions. Defendants also represented that Plaintiff would become Managing Director after one year of employment with LCE.

88.     Defendants' representations were false. LGO/LCE had no intention of employing Plaintiff for a year, and it had no intention of promoting Plaintiff to Managing Director. Rather, Defendants intended to, and did, lure Plaintiff from LCE's competitor Highview in order to gain

17

the immediate benefit of his experience, contacts, and stature to jumpstart their company. As soon as Plaintiff was hired, Defendants took the benefits from Plaintiff's years of work, and promptly let him go.

89.     Plaintiff has been damaged by, among other things, loss of income, loss of his $900,000 options package with Highview, and loss of reputation in his career.

COUNT II
Breach of Duty of Good Faith and Fair Dealing
(Against the Largo Defendants)

90.     Plaintiff repeats and realleges paragraphs 1-89 as if fully set forth herein.

91.     Within every contract is an implied duty of good faith and fair dealing.

92.     Plaintiff entered into an employment contract with the Largo Defendants which, among other things, allowed for Plaintiff to be promoted to Managing Director after one year of employment.

93.     The Largo Defendants never intended to promote Plaintiff or even to retain him as an employee and entered into the contract with the sole purpose of harvesting Plaintiff's experience and expertise in the energy industry to jumpstart LCE.

94.     Defendants took advantage of their discretion under the contract, including without limitation Plaintiff's at-will employment status, to deprive Plaintiff of the benefits of his employment contract. Plaintiff was not terminated through any fault of his own and Defendants have admitted as much by asking Plaintiff to continue working after his termination and waiving his non-compete clause.

95.     Plaintiff has been damaged by, among other things, loss of income, loss of his $900,000 options package with Highview, and loss of reputation in his career.

COUNT III
Tortious Interference With Contract and/or Business Advantage

(Against all Defendants)

96.     Plaintiff repeats and realleges paragraphs 1-95 as if fully set forth herein.

97.     Defendants intentionally interfered with Plaintiff's employment contract and the business advantages to be conferred upon Plaintiff by that contract.

98.     Defendants had no legitimate purpose for their actions and intended only to harm Plaintiff for their own needs.

99.     Defendants interfered with Plaintiff's existing contractual rights and not simply a prospective contractual right.

100.    Defendants acted with ill will or maliciousness.

101.    Plaintiff has been damaged by, among other things, loss of income, loss of his $900,000 options package with Highview, and loss of reputation in his career.

COUNT IV
Quantum Meruit
(Against all Defendants)

102.    Plaintiff repeats and realleges paragraphs 1-101 as if fully set forth herein.

103.    Plaintiff rendered work, labor and/or services for Defendants.

104.    Plaintiff's work, labor and/or services were of reasonable value.

105.    Defendants have not paid Plaintiff for the value conferred upon them.

106.    Plaintiff has been harmed thereby.

COUNT V
Conversion
(Against LGO and LCE)

107.    Plaintiff repeats and realleges paragraphs 1-106 as if fully set forth herein.

108.    Plaintiff was and is the owner of his cellular telephone number.

109.    Defendants have retained that phone number and have wrongfully exercised dominion and control over it. Plaintiff has demanded that Defendants return his telephone number, and Defendants have refused.

110.    Defendants have acted with the intent to deprive Plaintiff of his phone number.

111.    Plaintiff was damaged by Defendants' conduct.

COUNT VI
Declaratory Judgment
(Against the Largo Defendants)

112.    Plaintiff repeats and realleges paragraphs 1-111 as if fully set forth herein.

113.    Plaintiff's employment agreement included a non-compete clause.

114.    Plaintiff's employment was terminated without cause.

115.    Defendants state they have "waived" garden leave payments to Plaintiff, which appears to be a concession that Plaintiff was not terminated for cause and will not be bound by his non-compete.

116.    However, Defendants have not expressly stated that they are waiving the provisions of Plaintiff's non-compete agreement.

117.    Because Plaintiff's employment was terminated without cause, his non-compete agreement is unenforceable under applicable law.

118.    There exists an actual controversy with respect to Plaintiff's non-compete provision.

COUNT VI
Replevin Pursuant to Mass. Gen. L. c. 214, § 3
(Against the Largo Defendants)

119.    Plaintiff repeats and realleges paragraphs 1-118 as if fully set forth herein.

120.    Plaintiff's cellular phone number was property of Plaintiff.

121.    The Largo Defendants took or detained Plaintiff's property.

122.    Plaintiff has no adequate remedy at law.

123.    Pursuant to Mass. Gen. L. c. 214, § 3, Defendants should be required to return Plaintiff's cell phone number to him.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff prays that this Court grant Plaintiff  the following relief:

A.    Award Plaintiff all compensatory damages, punitive damages, liquidated damages, pre-judgment interest, and post-judgment interest, and any other damages that may be just and proper;

B.    Enter an Order declaring that Plaintiff's non-compete agreement is void under Massachusetts law;

C.    Enter an Order requiring the Largo Defendants to return Plaintiff's cellular telephone number;

C.    Award Plaintiff his reasonable attorneys' fees, costs and expenses incurred in the prosecution of this action; and

E.    Grant in favor of Plaintiff such other relief as may be just and proper.

<u>JURY TRIAL DEMAND</u>

Plaintiff demands a trial by jury on all issues so triable.


Dated: December 17, 2021                    Respectfully submitted,


                                             /s/ *Stephen Ryan, Jr.*
                                             Stephen Ryan, Jr. (BBO #669727)
                                             Mark A. Delaney (BBO# 652194)
                                             **RYAN LITIGATION AND ADVOCACY PLLC**

1167 Massachusetts Ave.
Arlington, MA 02476
Tel.:  617-762-5788
sryan@ryan-litigation.com

***Local Counsel***

**GARDY & NOTIS, LLP**
Orin Kurtz (*pro hac vice forthcoming*)
Tower 56
126 East 56th Street, 8th Floor
New York, New York 10022
Tel: (212) 905-0509
Fax: (212) 905-0508
okurtz@gardylaw.com

GREEN AND SPIEGEL LLC
Jonathan A. Grode (*pro hac vice forthcoming*)
1524 Delancey St., 4th Floor
Philadelphia, PA 19102
Tel: (215) 395-8959
jgrode@gands-us.com

*Attorneys for Plaintiff*